UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| INTEL CORPORATION | § | |
| | § | |
| vs. | § | CASE NO. 2:08-CV-319-CE |
| | § | |
| NEGOTIATED DATA SOLUTIONS, LLC | § | |

## MEMORANDUM OPINION AND ORDER

**I.    Introduction**

Pending before the court are the plaintiff Intel Corporation's ("Intel") motion for summary judgment of noninfringement (Dkt. No. 40) and the defendant Negotiated Data Solutions, LLC's ("N-Data") motion for summary judgment of non-license (Dkt. No. 77). Intel contends that it is licensed to use all four of the patents-in-suit, and thus it does not infringe any of those patents. N-Data responds that Intel is not licensed to use three out of the four patents in suit. In the alternative, N-Data argues that the license does not protect Intel against all claims of indirect infringement. For the reasons articulated below, Intel's motion for summary judgment is GRANTED in part and DENIED in part, and N-Data's motion for summary judgment is DENIED. The court holds that the license covers all four patents-in-suit. The court further holds that the license protect Intel against claims for indirect infringement on based on combinations of Intel products; however, the license may not protect Intel against all acts of indirect infringement.

**II.    Factual & Procedural Background**

Intel filed suit against N-Data on August 15, 2008, and one of its causes of action is a declaratory judgment of non-infringement. Intel argues that it is entitled to a judgment that it

does not infringe the four patents-in-suit, which are United States Patent Nos. 5,361,261 ("the '261 patent"), RE38,820 ("the '820 patent"), RE39,216 ("the '216 patent), and RE39,395 ("the '395 patent).

In 1976, Intel and NSC entered into a patent cross-licensing agreement ("License Agreement"). The License Agreement provides Intel with a permanent license to any patents owned or controlled by NSC ("National Patents") during the term of the agreement: "NATIONAL grants and agrees to grant to INTEL non-exclusive, nontransferrable, royalty-free, world-wide licenses under NATIONAL PATENTS and NATIONAL PATENT APPLICATIONS to make, to have made, to use, to sell (either directly or indirectly), to lease and to otherwise dispose of LICENSED PRODUCTS." According to the License Agreement:

> "NATIONAL PATENTS" means all classes or types of patents and utility models of all countries of the world, applications for which have a first effective filing date in any country prior to the date of expiration or termination of this Agreement, in respect of which, as of the EFFECTIVE DATE, or thereafter during the term of this Agreement, NATIONAL owns or controls . . . .

The License Agreement does not mention reissue patents or reissue applications. The License Agreement expired on December 31, 2003.

The '261 patent and U.S. Patent Nos. 5,533,018 ("the '018 patent"), 5,566,169 ("the '169 patent"), and 5,594,734 ("the '734 patent") all issued to NSC between 1994 and 1997. In 1998, NSC assigned these four patents to Vertical Networks, Inc. ("Vertical"). Between 1998 and 1999, Vertical filed applications with the PTO seeking to reissue the '018, '169, and '734 patents with broadened claim scope. In 2003 and 2005, Vertical assigned the '261, '018, '169, and '734 patents, as well as the pending reissue applications, to N-Data. In 2005 and 2006, the PTO issued the '820, '216, and '395 reissue patents to N-Data.

A patentee may apply for reissue based upon one of the following errors in the issue patent: a defect in the specification, a defective drawing, a claim that is too narrow, and a claim that is too broad. 35 U.S.C. § 251; *In re Amos*, 953 F.2d 613, 616 (Fed. Cir. 1991). The legal effect of reissue is described by 35 U.S.C. § 252, which states in part:

> The surrender of the original patent shall take effect upon the issue of the reissued patent, and every reissued patent shall have the same effect and operation in law, on the trial of actions for causes thereafter arising, as if the same had been originally granted in such amended form . . . .

Likewise, according to the Federal Circuit, "reissues are deemed by operation of law to replace the surrendered originals and, thus, are entitled to treatment as original patents." *Cooper Techs. Co. v. Dudas*, 536 F.3d 1330, 1341 (Fed. Cir. 2008).

## III. Discussion

### A. License to the Reissue Patents

The parties' license dispute presents a single issue: under the License Agreement, should the reissued patents be treated as "National Patents"? If the reissued patents are National Patents, then Intel's license to those patents survived the termination of the License Agreement.[1]

N-Data contends that Intel's license does not extend to the reissue patents, because they are not "National Patents." N-Data notes that the term "National Patents" covers only patents that NSC owned or controlled during the time of the License Agreement. Vertical filed the reissue applications, and the resulting reissue patents issued in N-Data's name; thus, according to the argument, at no time did NSC own or control these patents. Furthermore, according to N-

---

[1] The License Agreement states, "[I]n the event of expiration of the term of this Agreement . . . , the licenses and mutual releases granted pursuant to this Agreement . . . shall survive, on royalty-free basis, for the life or lives of . . . NATIONAL PATENTS . . . issued as of the date of such expiration . . . ."

3

Data, the License Agreement's silence on licensing of reissue patents indicates the parties' intent that reissues would not be covered by the agreement. Intel responds by noting that the three originally-granted patents, the '018, '169, and '734 patents, were licensed National Patents. Intel thus argues that this license also applies to the three reissue patents that issued from the originally-granted patents.

The License Agreement is a cross-license that confers patent rights between Intel and NSC. The agreement uses concise language to grant broad rights to all patents owned or controlled by the other party for the life of the patents. Thus, based upon the face of the License Agreement, the mutual intent of the parties was to grant each other broad patent rights and avoid future infringement suits. *See* Cal. Civ. Code § 1636 ("A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting . . . .").

The parties' mutual intent would be frustrated if the scope of the License Agreement does not include reissue patents. Under N-Data's interpretation of the License Agreement, when a patent reissues, the other party not only has no license rights to the new reissue patent, but the party also loses its existing rights to the original patent. A party could, in effect, revoke the License Agreement by putting its licensed patents into reissue. *See generally* 35 U.S.C. § 251 (stating that a non-broadening reissue can occur at any time during the life of the original patent). Such a result would defeat the principal aim of the License Agreement–to provide the parties with licenses to each other's patent portfolio for the lives of the patents.

The court is also persuaded by the reasoning of the *Motorola, Inc. v. Analog Devices, Inc.* and *Hoechst Celanese Corp. v. BP Chemicals Ltd.* cases, which interpreted license agreements to cover subsequent continuation patents. *Motorola, Inc. v. Analog Devices, Inc.*, 2004 WL

5633740 (E.D. Tex. Aug. 10, 2004); *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 844 F. Supp. 336 (S.D. Tex. 1994), *aff'd in part, vacated in part on other grounds*, 65 F.3d 188 (Fed. Cir. 1995). In the *Motorola* case, ADI had granted Motorola a license to patents "issued or applied for as of January 1, 1988." *Motorola*, 2004 WL 5633740, at *1. ADI sued Motorola on a continuation patent that was filed after January 1, 1988, but was based on a parent application filed before that date. *Id.* ADI argued that Motorola had no license to the continuation patent based on the post-1998 filing date. *Id.* at *4. But the court rejected ADI's argument and held,

> A fair and reasonable interpretation of the agreement does not lead to a conclusion that the parties intended that either Motorola or ADI could, by the simple subterfuge of filing a continuation application, weasel out of their agreement as to an application for an invention which might suddenly have become profitable.

*Id.* Likewise, *Hoechst* considered a licensor's argument that a continuation patent's filing date fell outside the scope of the license agreement, even though its effective filing date was within the agreement's scope. *Hoescht*, 844 F. Supp. at 344. The court stated that "such an interpretation would lead to blatantly irrational results" and held that the license covered the continuation patent. *Id.*

There are several relevant similarities among *Motorola*, *Hoechst*, and this case. In all three cases, the licensees unquestionably had rights to an earlier-filed patent or patent application. In each case, the licensor or licensor's assignees filed new applications based upon the original patent. In this case and in *Motorola*, the licensor or its assignees eliminated the licensee's rights to the original patent or application, either through termination or surrender, and claimed that the licensee had no license to the newly-issued patent. As in the *Motorola* and *Hoechst* cases, this court is persuaded that Intel's rights under the License Agreements are not

5

defeated through the filing of reissue applications. Intel had a permanent license to the '018, '169, and '734 patents, and these rights extend to the subsequent '820, '216, and '395 reissue patents, which are deemed to replace the originals.

The court is not persuaded that the *Intergraph* and *Altvater* decisions compel a conclusion that the License Agreement does not cover N-Data's reissue patents. In *Intergraph Corp. v. Intel Corp.*, 241 F.3d 1353 (Fed. Cir. 2001), Intel unsuccessfully argued that it had a license to asserted patents, pursuant to the same NSC-Intel License Agreement at issue in this case. *See id.* at 1354-56. But the term "National Patent Applications," not "National Patents," was primarily at issue in *Intergraph*. *Id.* at 1355. The applications at issue were owned by Fairchild Semiconductor Company ("Fairchild") and were acquired by Intergraph Corp. ("Intergraph") in a three-way transaction involving Intergraph, NSC, and Fairchild. *Id.* at 1354. The applications were technically owned by NSC for a short time during the closing of the transaction, but the intent of the transaction was to vest ultimate ownership of the applications (an eventually any patents that issued therefrom) with Intergraph. *Id.* at 1355-56. Because "National Patent Applications" includes only applications that "when issued, will become National Patents," the Federal Circuit held that Intel did not have a license. *Id.* In the present case, Intel argues that N-Data's reissue patents are effectively National Patents, because the originally-granted patents were National Patents, so *Intergraph*'s holding does not control.

In *Altvater v. Freeman*, 319 U.S. 359 (1943), the Supreme Court's discussion of the effect of reissue on a license consists of a single sentence: "In the present case both the District Court and the Circuit Court of Appeals have found that the license agreement was terminated on the surrender of the original patent and was not renewed and extended to cover the reissue

patents." *Id.* at 364. But the factual scenario in *Altvater* is also distinguishable from the dispute at hand. There, a patent was licensed, and the licensed patent was later invalidated. *Freeman v. Altvater*, 129 F.2d 494, 497 (8th Cir. 1942), *rev'd*, 319 U.S. 359 (1943). The patentee corrected the invalidated patent through reissue. *Id.* Although some language in the case supports N-Data's argument, it was not disputed that the licensees had the right to terminate the license upon the judgment of invalidity. It thus appears that the legal dispute decided by the lower courts, and mentioned in the quoted language above, was whether the prior licensees accepted an offer of a new license to the reissued patents. *See id.* at 498-99. *Altvater*'s holding on the offer and acceptance of a license contract has no bearing on the present dispute. Therefore, the court holds that Intel is licensed, pursuant to the License Agreement, for '261, '820, '216, and '395 patents.

### B. Indirect Infringement

N-Data argues that, even if the court finds that the License Agreement covers all four patents-in-suit, the License Agreement does not protect Intel against claims of indirect infringement. Intel responds that the language of the License Agreement protects Intel against all claims of infringement, direct and indirect.

The License Agreement grants rights only to NSC, Intel, and their subsidiaries. The agreement authorizes Intel "to make, to have made, to use, to sell (either directly *or indirectly*), to lease and to otherwise dispose of LICENSED PRODUCTS." (emphasis added). "Licensed products" are defined as "any product manufactured, used or sold by either party covered by the patents of the other party."

Because the License Agreement allows Intel to make, have made, use, sell, lease, or otherwise dispose of products covered by the patents-in-suit, Intel cannot be liable for direct

7

infringement. The License Agreement also licenses Intel to "directly or indirectly" sell products covered by the patents-in-suit. Thus, Intel cannot be liable for indirect infringement related to sales of product combinations that include Intel products. As such, summary judgment is proper as to any such claim of indirect infringement. It is unclear whether and to what extent Intel is otherwise accused of indirect infringement. As such, summary judgment on any other grounds would be premature. Therefore, the court concludes that Intel does not directly infringe the '261, '820, '216, and '395 patents, nor does it indirectly infringe those patents based upon the sales activities of third-parties incorporating Intel products.

**IV.     Conclusion**

For the reasons presented above, N-Data's motion for summary judgment of non-license is denied, and Intel's motion for summary judgment of non-infringement is granted-in-part and denied-in-part. The court holds that the License Agreement applies to all four patents-in-suit. The court further concludes that the License Agreement protects Intel against claims of direct infringement as well as allegations of indirect infringement based upon sales by third parties incorporating Intel products.

SIGNED this 18th day of March, 2010.

_____
CHARLES EVERINGHAM IV
UNITED STATES MAGISTRATE JUDGE